**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JOSUE F. DEJESUS,**

**Plaintiffs** :

**v.**

**CITY OF PATASKALA, *et al.*,**

**Defendants.** :

**Case No. 2:25-cv-139**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by the City of Pataskala and Mayor Michael Compton. (ECF No. 19.) Josue DeJesus responded (Resp., ECF No. 24), and Defendants replied (Reply, ECF No. 25). The Motion is fully briefed and ripe for consideration.

For the reasons below, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

## I. STATEMENT OF FACTS

Pataskala hired Officer DeJesus as a police officer in December 2017. (DeJesus Dep. 11:3–10, ECF No. 18.) He served as a patrol officer working second shift until October 2019, when he accepted a higher-paying position at the Genoa Township Police Department. (*Id.*, 11:11–21.) But he soon realized he had made the wrong decision, so he spoke with Pataskala's Chief of Police (Bruce Brooks) about coming back to work for the City. (*Id.*, 12:10–13:2.) Although Pataskala had already filled his position, Chief Brooks allowed Officer DeJesus to return in November

2019 and resume his duties as a second-shift patrol officer. (*Id.*, 12:16–14:9; ECF No. 23-8.) Near the end of 2022, Officer DeJesus began working as a K-9 Officer. (DeJesus Dep. 14:16–22.)

In July 2023, Sergeant Michael Dillon issued Officer DeJesus a written reprimand for violating two department policies stemming from his conduct at a potential crime scene a few months earlier. (*See* ECF No. 19-2.) Another officer (Cami Finley) had called Officer DeJesus to the scene and sought his guidance as her Officer in Charge about what steps she needed to take to investigate a reported crime. (*See id.*; DeJesus Dep. 25:13–15.) Despite knowing that "there was evidence of said crime that needed to be preserved" and "suspects who needed to be identified[,]" Officer DeJesus's "focus was on why there would not be prosecution for one reason or another." (ECF No. 19-2; *see also* Brooks Dep. 29:7–11, ECF No. 23-13 ("…Officer DeJesus had them leave the scene without collecting the evidence.").) Sergeant Dillon concluded the written reprimand by observing that officers must "act to preserve evidence and thoroughly investigate when we can do so" and that "[i]t is always better to document and collect evidence and not need it than to ignore evidence that you need and cannot get back." (ECF No. 19-2.)

A year later, on July 25, 2024, several individuals in Pataskala's administration—including Mayor Compton and members of the City Council—received an unsigned email from an anonymous address (*anonppd@yahoo.com*). (ECF No. 19-3.) The sender indicated that he was writing out of "fear and anger" as "a member or past member of the [City's] police department" to raise awareness of

"problems" within the department and "issues [ ] internally between patrolm[e]n and the current administration." (*Id.*) Among other things, the sender complained that department leadership made unfair disciplinary, scheduling, and promotional decisions while fostering an environment in which officers could not speak out or protest for fear of retaliation. (*Id.*) By way of example, the sender accused Officer Finley of discarding evidence and lying about it, but the sender observed that her actions were "swept under the rug" and that the department instead promoted her to a position over another candidate with more experience. (*Id.*)

Mayor Compton was unhappy after reading the email. (Compton Dep. 18:25–19:3, ECF No. 17.) He felt that the email contained dishonest, "baseless accusations" meant to "attack the police management[,]" though he "didn't take much stock" in the email because he thought it was only an anonymous sender's opinion. (*Id.*, 18:5–19:7, 21:4–22:2.) He reached out to see if Chief Brooks knew about the email, and the two decided that they were not "going to take it any further[.]" (*Id.*, 23:15–24:5.) Still, Mayor Compton asked Chief Brooks to "keep [him] posted." (*Id.*, 27:8–14.)

Mayor Compton also discussed the email with the City Council during an executive session. (Compton Dep. 17:11–17, 23:22–24:7, 25:3–13; Brooks Dep. 17:4–19.) For his part, Chief Brooks sent a response to the email, in which he rebutted each assertion and wrote that "[t]he allegations about [O]fficer Finley lying hurt[ ] [him]" because they were "just not true all." (ECF No. 23-4.)

The email impacted morale within the police department, and a few officers complained to Chief Brooks. (Brooks Dep. 17:4–19.) Sergeant Dillon thought that the sender "should not be able to get away with that," while Officer Finley was upset because the allegations "did not represent correctly the incident that happened." (*Id.*, 19:14–19, 29:20–31:1.) According to Chief Brooks, the Pataskala Prosecutor's Office confirmed that Officer Finley's conduct with respect to handling evidence did not negatively impact the underlying case. (*Id.*, 24:15–25:22; *see also* ECF No. 23-4.) Consequently, Chief Brooks started an investigation into the email. (Brooks Dep. 17:4–19.)

Detective Sergeant Gary Smith interviewed Officer DeJesus as part of the email investigation in October 2024. (DeJesus Dep. 32:11–33:20.) Sergeant Smith gave Officer DeJesus a *Garrity* warning[1] and asked him about the email, but Officer DeJesus denied knowing anything about it. (*Id.*, 33:9–34:2.) Sergeant Smith also asked Officer DeJesus about whether he had any involvement with John Lane, a man whose phone number the City discovered was associated with the sender's account. (*Id.*, 34:3–36:8, 41:1–8.) In response, Officer DeJesus did not deny knowing Mr. Lane, but he denied any involvement with Mr. Lane in the context of the email. (*Id.*, 34:3–36:8).

[1] "A *Garrity* interview is an examination of a public employee during an internal investigation of the employee's official conduct." *Gaddis v. City of Detroit*, 649 F. Supp. 3d 469, 491 n.6 (E.D. Mich. 2023) (citing *Garrity v. New Jersey*, 385 U.S. 493 (1967)). "*Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation." *McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005).

Shortly after the interview ended, Sergeant Phil Gavin instructed Officer DeJesus to report to Chief Brooks's office, where Chief Brooks and Deputy Chief Michael Boals were waiting. (DeJesus Dep. 37:5–38:7.) Chief Brooks told Officer DeJesus that the department was placing him on administrative leave and that he needed to make himself available for a polygraph test. (*Id.*, 38:10–23.) Officer DeJesus then asked to speak with Chief Brooks alone, so Deputy Chief Boals and Sergeant Gavin left the room. (*Id.*, 39:10–14.) Officer DeJesus admitted to Chief Brooks that he had drafted the email, created an anonymous email account using Mr. Lane's information, and sent the email from that account. (*Id.*, 39:24–41:8; *see also* DeJesus Aff. ¶ 7, ECF No. 23-1.) Chief Brooks responded that he would "go easy" on Officer DeJesus, rescinded his administrative leave, and disciplined him with a one-day unpaid suspension. (DeJesus Dep. 42:4–45:1; ECF Nos. 19-4, 23-3.)

Mayor Compton was "extremely disappointed" and "shocked" when Chief Brooks told him that Officer DeJesus sent the email. (Compton Dep. 12:1–7, 16:12–19, 27:15–21.) At some point, Mayor Compton expressed his dissatisfaction with the severity of the discipline that Chief Brooks imposed. (*Id.*, 36:14–37:1 ("[W]hen I found out that he had lied because he said he didn't write the e-mail and then he admitted that he wrote the e-mail, that brought on more disappointment from me, and I may have expressed to the [Chief] that, you know, only one day, but it was his decision."); Brooks Dep. 31:16–22 ("The mayor asked me if I thought—questioned if a one-day suspension was enough.").) Chief Brooks met with Officer DeJesus and his union attorney for a pre-disciplinary hearing, and he wrote in a memorandum

for Officer DeJesus's personnel file that "[d]uring the meeting I was asked no less than three times if I would remove anything relating to dishonesty. I refused to do so because the allegation in the email against Officer Finley was that she was dishonest[.] … That along with the fact that I took grief from the mayor for only giving a one-day suspension. Termination was recommended."[2] (ECF No. 23-3.) Officer DeJesus then filed a grievance over the one-day suspension, and he planned to meet with Chief Brooks and others in December 2024 about the same. (DeJesus Dep. 45:6–50:8.) The grievance was ultimately dropped. (*Id.*)

In the early hours of December 7, 2024, Officer DeJesus was on patrol working second shift. (DeJesus Dep. 53:11–23.) At approximately 12:41 a.m., he drove his police cruiser through the ATM lane at the Pataskala Banking Company so he could position his cruiser to face State Route 310. (*Id.*, 53:24–55:2.) While doing so, he felt "a thud or a bump" and assumed his tire had hit the curb. (DeJesus Aff. ¶ 8.) He got out and looked at the bumper of his cruiser and the ATM machine but did not notice any damage. (*Id.*)

On December 10, 2024, Officer DeJesus was supposed to meet with Chief Brooks, Deputy Chief Boals, and his union attorney about his grievance over his one-day suspension. (DeJesus Dep. 51:5–52:1.) However, when Officer DeJesus arrived, Deputy Chief Boals handed him a *Garrity* warning and told him that he would be questioned about the "non-injury accident" that had occurred at the bank

[2] Chief Brooks could not recall who made the termination recommendation (though he testified that it was not Mayor Compton) or why he used that language in his memorandum. (Brooks Dep. 32:3–24.)

three days earlier. (*Id.*; ECF No. 19-5.) Officer DeJesus was told that someone from the bank had reported damage to the ATM. (DeJesus Dep. 52:18–53:5.) When asked if he had hit the ATM with his cruiser, Officer DeJesus responded that he did not believe he had. (*Id.*, 55:3–9.) Chief Brooks proceeded to show Officer DeJesus several videos from different cameras, after which Officer DeJesus conceded that his cruiser had hit the ATM but insisted that he was not aware of the collision at the time. (*Id.*, 52:8–53:10, 55:10–19; DeJesus Aff. ¶ 8.)

Chief Brooks then placed Officer DeJesus on administrative leave and scheduled a pre-disciplinary hearing. (DeJesus Dep. 57:4–19.) But Officer DeJesus did not want to wait, so he and his union attorney continued meeting with Chief Brooks. (*Id.*) Chief Brooks referenced Officer DeJesus's lie about sending the email and expressed that he did not believe Officer DeJesus was telling the truth about the ATM incident. (*Id.*, 56:10–62:5; DeJesus Aff. ¶ 9.) Although Officer DeJesus counter-proposed a two-day suspension, Chief Brooks gave him the option to resign or be terminated and offered him two days to decide. (DeJesus Dep. 60:2–24.) When Officer DeJesus did not resign, Chief Brooks fired him on December 12, 2024. (*Id.*, 61:1–3, 62:23–63:2; Compton Dep. 11:5–7; ECF No. 19-6.) Officer DeJesus filed a grievance over his termination, which led to an arbitration proceeding. (DeJesus Dep. 63:3–8; DeJesus Aff. ¶ 3.)

After Officer DeJesus's termination, Mayor Compton sent an email to members of the City Council and others, in which he wrote, "[U]nfortunately today we had to terminate the employment of [Officer DeJesus]. Honesty and integrity

issues prompted this decision, and after several months of this continued conduct, the decision to terminate was made. … [I]f you have questions or comments, please feel free to contact myself or Chief Brooks." (ECF No. 23-11.)

Officer DeJesus was not without employment for long—in March 2025, the Minerva Park Police Department hired him as a patrol officer. (DeJesus Dep. 16:11–21, 23:21–24:2.) Minerva Park paid him a slightly higher base rate than the City and offered him comparable benefits, but his total earnings were less at Minerva Park because he was not a K-9 officer there. (*Id.*, 18:12–20:17.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## III. ANALYSIS

Officer DeJesus sued the City and Mayor Compton in February 2025. (*See* Compl., ECF No. 1.) They now move for summary judgment on his claims. (*See* Mot., PAGEID # 153.) Exactly what those claims are, though, is not readily apparent from the face of the Complaint because Officer DeJesus, despite being represented by counsel, does not enumerate any particular causes of action therein—instead, he sets forth factual allegations, broadly refers to several federal and state constitutional and statutory provisions, and demands judgment in his favor. (*See generally* Compl.)

Upon review of the Complaint and Officer DeJesus's arguments in opposition to Defendants' Motion (which are both difficult to follow), the Court interprets this case as raising (1) First Amendment retaliation claims under 42 U.S.C. § 1983 against the City and Mayor Compton in his personal and official capacities;[3] and

---

[3] Insofar as Officer DeJesus also brings claims under the Ohio Constitution (*see* Compl. ¶ 13; Resp., PAGEID # 487), "the free speech guarantees accorded by

(2) state-law claims against both Defendants for interference with civil rights and civil damages for criminal acts. (*See* Compl. ¶¶ 13–17; Resp., PAGEID ## 488–89, 505–11.)

Defendants mount only a limited attack on the merits of Officer DeJesus's federal claims, focusing on the extent of Mayor Compton's involvement and the existence of a municipal policy or custom but not on the core issue of whether the City or Mayor Compton retaliated against Officer DeJesus in violation of the First Amendment. (*See* Mot., PAGEID # 153; Reply, PAGEID # 514.) It is through this restricted lens that the Court evaluates Officer DeJesus's claims below.

### A. First Amendment Retaliation Claim against the City

Officer DeJesus argues that the City violated his First Amendment rights when Chief Brooks (with Mayor Compton's support) terminated him in retaliation for sending the email criticizing the department's operations. (Compl. ¶¶ 12–16; Resp., PAGEID ## 500–01, 507–10.) On the other side, the City insists that Mayor Compton was not involved in the termination and that Chief Brooks's decision was not an illegal policy or custom subjecting to City to liability.[4]

---

the Ohio Constitution are no broader than the First Amendment, and … the First Amendment is the proper basis for interpretation of Section 11, Article I of the Ohio Constitution." *Eastwood Mall, Inc. v. Slanco*, 626 N.E.2d 59, 61 (Ohio 1994); *see also Logsdon v. Hains*, 492 F.3d 334, 347 (6th Cir. 2007) ("Article I, Section 11 of the Ohio Constitution is interpreted in lockstep with the First Amendment to the U.S. Constitution." (citation omitted)).

[4] Defendants also emphasize that Officer DeJesus chose not to sue Chief Brooks, positing that a court cannot impose liability on a municipal employer if it concludes that the defendant-employee—here, only Mayor Compton—did not violate the plaintiff's constitutional rights. (*See* Mot., PAGEID # 164; Reply, PAGEID # 520.) Not so. Putting aside the Court's finding of a genuine issue of material fact

Municipalities may be liable under § 1983 for depriving citizens of rights secured by the Constitution. *See Monell v. Dept of Soc. Servs.*, 436 U.S. 658, 690 (1978). But "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691 (emphasis in original). Instead, "[t]o prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694); *see also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) ("Municipal liability only attaches where a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights." (citation omitted)). There are at least four ways that a plaintiff may prove the existence of a municipality's illegal policy or custom. *Thomas*, 398 F.3d at 429. A plaintiff may look to:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

---

as to Mayor Compton's personal conduct (*see* Section III.B.2. *infra*), a municipality may be liable "based on the actions of individual government actors other than those who are named as parties." *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018) (citations omitted). That Officer DeJesus did not name Chief Brooks as a Defendant, then, does not insulate the City from potential liability stemming from his decisions.

Relevant here, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (plurality). But "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." (citation omitted)); *Heyerman*, 680 F.3d at 648 ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (citation omitted)). "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

Courts may not "assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126. Identifying policymaking officials "is a question of state law requiring the examination of local ordinances and regulations in order to determine the official or body that has the responsibility for making law or setting policy in any given area." *Culberson v. Doan*, 125 F. Supp. 2d 252, 273 (S.D. Ohio 2000) (Spiegel,

J.) (citing *Praprotnik,* 485 U.S. at 124); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." (emphasis omitted)). The authority to make municipal policy may, for instance, be granted directly by legislative enactment or delegated by the person possessing such authority. *Pembaur,* 475 U.S. at 483. Courts may also consult less-formal sources of law such as local practice and custom. *Jett*, 491 U.S. at 737.

To hold the City liable in this case, the Court must find that the decision to fire Officer DeJesus was made or ratified by an official with final authority to establish the City's policy in that area. Officer DeJesus points to Mayor Compton and, by virtue of Mayor Compton's delegation of his authority, Chief Brooks. (Resp., PAGEID ## 507–10.) Upon review, the Court agrees that Mayor Compton was the final policymaker as a matter of law, but genuine factual issues remain as to the extent to which he delegated his authority to Chief Brooks or ratified the termination decision.

The Pataskala City Charter outlines the powers of the City Council, the mayor, and other administrative officials. (*See* ECF No. 23-12.) Among other things, the City Council has the power "to adopt and to provide for the enforcement of local police[.]" (*Id.*, PAGEID # 381.) The City Council also has "[t]he power, by ordinance or resolution, to establish or authorize the number of officers and employees in the various offices, departments, [and] divisions … of the City and to establish or

authorize the establishment of the rate of their compensation, hours of work, and to provide such other fringe benefits and conditions of employment[.]" (*Id.*, PAGEID # 382.) This includes the City's police department. (*Id.*); *cf.* Ohio Rev. Code. § 737.05 ("The police department of each city shall be composed of a chief of police and such other … employees as the legislative authority thereof provides by ordinance.").

Although the City Council has legislative power over the general composition and overarching metrics of the police department, the City Charter makes clear that the mayor appoints the police chief and that department operations are "under the general direction and supervision of the mayor." (ECF No. 23-12, PAGEID # 395; *see also* ECF No. 23-3 (memorandum from Chief Brooks stating that "[t]he council decided that it wasn't their job to do an investigation into the [email] and that the mayor was in charge of the police department and it was his issue to address"); *cf.* Ohio Rev. Code § 733.35 ("The mayor of a municipal corporation shall have general supervision over each department and the officers provided for in Title VII of the Revised Code."). Nothing suggests that the mayor's authority to generally direct and supervise does not include the power to demote or discharge. And there is no evidence, in the City Charter or elsewhere, that the City Council must review or approve of individual police employment decisions.[5]

[5] "The dismissal or suspension of unclassified personnel may be appealed to the Council for review," but Officer DeJesus was a classified employee. (ECF No. 23-12, PAGEID # 397; ECF No. 23-7.) The City Charter establishes a "Personnel Board of Review," which "shall have the power and duty to hear appeals from administrative determinations made pursuant to ordinances and resolutions setting forth personnel practices and procedures[.]" (ECF No. 23-12, PAGEID # 397.) That Board "hear[s] appeals by City employees in the classified service, who are not part of a grievance procedure under a labor contract, and who have been suspended,

In this case, both Mayor Compton and Chief Brooks affirmed that Mayor Compton oversees the City's police department. (Compton Dep. 13:10–15:4 ("Q. As the mayor, are you responsible for the conduct of your police department at Pataskala? A. Yes. … On paper, I'm over the police department[.]"); Brooks Dep. 13:21–14:9 ("The [M]ayor is the head of the police department.").) Indeed, Mayor Compton was Officer DeJesus's appointing authority. (ECF Nos. 23-8, 23-9.) Even though Chief Brooks managed day-to-day department operations, he was subordinate to Mayor Compton, and Mayor Compton's supervision constrained his decisions. Chief Brooks thus could not make final and unreviewable decisions, meaning he was not responsible for establishing City policy with respect to police discipline—that role belonged to Mayor Compton. Consequently, the Court finds as a matter of law that Mayor Compton was the final policymaking official when it came to the City's decisions to terminate police officers, including Officer DeJesus.

But is undisputed that Chief Brooks—not Mayor Compton—decided to fire Officer DeJesus. (Compton Dep. 11:20–21, 12:19–24; Brooks Dep. 8:1–8; DeJesus Dep. 60:10–13; ECF No. 19-6.) That said, Officer DeJesus has put forth evidence

---

demoted in position or compensation, or discharged." City Employee Handbook and Policy Manual at 30 (Oct. 5, 2020) (available at *https://www.cityofpataskalaohio.gov/humanresources#occdrw*); *see also Hughes v. City of Wayne, Mich.*, No. 22-1178, 2023 WL 3093900, at *4 (6th Cir. Apr. 26, 2023) ("[C]ourts ... can take judicial notice of, for example, administrative rules, regulations, and orders, and certain judicial and public records[.]" (citation omitted)). But Officer DeJesus was encompassed by a labor contract—namely, the City's Collective Bargaining Agreement. (*See, e.g.*, DeJesus Dep. 45:6–24.) And, in any event, "[w]hether an official is a policymaker depends on whether [his] word is final within [the City's] structure of government, not on whether a neutral decisionmaker ultimately can undo its decisions." *Mazzola v. Togliatti*, No. 1:19-CV-02519, 2020 WL 6083276, at *7 (N.D. Ohio Oct. 15, 2020) (internal quotations and citation omitted).

that could lead a reasonable jury to find that Chief Brooks made that decision using the final authority that Mayor Compton delegated to him. (*See* Resp., PAGEID # 500.) Most persuasively, Mayor Compton and Chief Brooks testified as much. (Compton Dep. 11:8–19 ("Q. … Did you have any role at all in determining whether or not there was just cause to terminate my client's employment? A. No, sir. That was left up to the chief of police."), 12:1–24 ("Q. So you put 100 percent of the responsibility for deciding whether to keep or fire my client on the hands of the chief of police? A. Well, the chief of police—the mayor's job is part-time. … So I leave those decisions up to him. We discuss them, but the decisions are his."), 13:14–14:1, 42:2–8; Brooks Dep. 8:1–4 ("Q. Okay. According to the mayor, you were responsible for ending his employment at the city? A. Yes, sir.").) As such, there is a genuine dispute as to whether the City can be held liable here. *See, e.g.*, *Klosowski v. City of Bay City*, 696 F. App'x 707, 716 (6th Cir. 2017) (reversing lower court's judgment on municipal liability claim and finding that defendant city delegated authority to plaintiff's supervisor, "a decision that would subject it to municipal liability if a jury determines that [supervisor's] final decision … violated the Constitution").

Officer DeJesus also points to evidence from which a reasonable jury could find that Mayor Compton ratified Chief Brooks's termination decision. (*See* Resp., PAGEID ## 500, 506–08.) "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final [policy]." *Praprotnik*, 485 U.S. at 127; *see also Arnold v. City of Columbus*, 515 F. App'x 524, 538 (6th Cir. 2013) ("[A]

municipality can be liable for a decision made by a subordinate if the decision was ratified by a final policymaker." (citation omitted)). "Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate." *Feliciano*, 988 F.2d at 656 (citation omitted); *see also, e.g.*, *Myers v. Pike Cnty., Ohio*, No. 2:23-CV-4102, 2025 WL 2781549, at *7 (S.D. Ohio Sept. 30, 2025) (Watson, J.) ("Simply going along with discretionary decisions made by one's subordinates, on [ ] one occasion without more, does not amount to the creation of municipal policy." (citation omitted)).

Mayor Compton did not directly order Chief Brooks to fire Officer DeJesus, nor did Chief Brooks affirmatively ask Mayor Compton for guidance on the decision. (Compton Dep. 11:11–12:24; Brooks Dep. 8:5–8, 32:21–24, 31:2–7.) But Mayor Compton was not entirely divorced from the termination. In particular, Mayor Compton told Chief Brooks to "keep [him] posted" about the email investigation and the decision to discipline the sender. (Compton Dep. 11:22–12:7, 27:8–14.) Mayor Compton was "extremely disappointed" to hear that Officer DeJesus had sent the email and arguably thought he deserved harsher punishment. (*Id.*, 16:12–19, 36:14–37:1.) Chief Brooks also kept Mayor Compton "apprised" of the ATM incident and showed him the videos "because it was getting serious" and "close to termination[.]" (*Id.*, 41:13–25.) Perhaps most suggestive of Mayor Compton's approval of Chief Brooks's decision is his post-termination email to the City Council and others, in which he wrote that "today *we* had to terminate the employment of [Officer DeJesus]" because of "[h]onesty and integrity issues" and that recipients could

contact him with questions. (ECF No. 23-11 (emphasis added).) These points, viewed in a light favorable to Officer DeJesus, belie Defendants' position that Mayor Compton was simply "not involved" in the termination. Officer DeJesus has raised factual issues about whether Mayor Compton approved of Chief Brooks's decision to fire him and its basis, as well as factual issues about whether that ratification was a moving force behind his injury. *See also, e.g.*, *Mazzola*, 2020 WL 6083276, at *7 (denying summary judgment because "[w]hether the mayor ratified the investigation or the potential punishment are factfinder questions").

Accordingly, the Court **DENIES** summary judgment to Defendants on Officer DeJesus's First Amendment retaliation claim against the City.

### B. First Amendment Retaliation Claims against Mayor Compton

Officer DeJesus brings a First Amendment retaliation claim against Mayor Compton in his official and personal capacities. (Compl. ¶ 3; Resp., PAGEID # 506.)

#### 1. Official-Capacity Claim

An official-capacity action "is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted). Where, as here, a plaintiff asserts a § 1983 claim against both a government entity and a government actor in his official capacity, dismissal of the duplicative claim against the actor is appropriate. *See Waddell v. Lewis*, No. 1:22-CV-635, 2024 WL 1071900, at *2 (S.D. Ohio Mar. 12, 2024) (McFarland, J.) ("[C]ourts regularly dismiss as redundant claims against agents in their official capacities when the principal entity is also named as a defendant in the suit." (citation omitted)). Because Officer DeJesus's official-capacity claim against Mayor

Compton mirrors his claim against the City, the Court **GRANTS** summary judgment to Defendants on that duplicative claim. *See, e.g.*, *Jackson v. Shelby Cnty. Gov't*, No. 07-6356, 2008 WL 4915434, at *2 (6th Cir. Nov. 10, 2008).

### 2. Personal-Capacity Claim

Officer DeJesus also targets Mayor Compton in his personal capacity, arguing that Mayor Compton, as "supervisor of the police department," was "in a position to stop" the termination but "instead acquiesced … after knowing about it" and taking credit for it. (*Id.*, PAGEID # 507.) Defendants respond that Mayor Compton is not personally liable because he was not sufficiently involved in the termination. (Mot., PAGEID # 161; Reply, PAGEID # 514.)

A supervisor "cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another," meaning that a supervisor's "mere failure to act will not suffice to establish supervisory liability." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). Instead, for Officer DeJesus to avoid summary judgment on this claim, he must raise a factual issue as to whether Mayor Compton personally caused the deprivation of his rights, as distinguished from any deprivation caused by the City's policy or custom. *See id.* ("We have long held that supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." (citation omitted)); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989) ("[O]fficials should be personally liable in damages only for their own unconstitutional behavior."). So, Officer DeJesus must provide evidence from which

a reasonable jury could conclude that Mayor Compton "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Peatross*, 818 F.3d at 242. At a minimum, Officer DeJesus must point to evidence that Mayor Compton "at least implicitly authorized, approved, or knowingly acquiesced in" Chief Brooks's conduct. *Id.* (citations omitted); *cf. Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (noting that encouragement, authorization, approval, and knowing acquiescence are sufficient to confer liability). He has done so for the reasons explained above. (*See* Section III.A. *supra*.)

Because Officer DeJesus has raised genuine issues of material fact concerning whether Mayor Compton authorized or encouraged Chief Brooks's decision to terminate him, the Court **DENIES** summary judgment to Defendants on the personal capacity claim against Mayor Compton.

**C. State-Law Claims**

Lastly, Officer DeJesus lodges claims under Ohio law against both Defendants for interference with civil rights and civil damages for criminal acts. (Compl. ¶ 17.) These claims lack merit and cannot survive summary judgment.

The Complaint alleges that Defendants' conduct "amounts also to intimidation of a public officer" under Ohio Revised Code § 2921.45. (Compl. ¶ 17; *see also* Resp., PAGEID # 511.) But that statute is criminal in nature. *See* Ohio Rev. Code § 2921.45(B) ("Whoever violates this section is guilty of interfering with civil rights, a misdemeanor of the first degree."). Although Officer DeJesus is correct that "individuals like [Mayor Compton] are subject to the criminal laws of the State of Ohio" (Resp., PAGEID # 511), there is not a civil cause of action available under the

criminal statute that he invokes. *See, e.g.*, *Waseleski v. City of Brooklyn*, No. 1:23-CV-00548, 2025 WL 896097, at *10 (N.D. Ohio Mar. 24, 2025) (citing cases).

The other statute under which Officer DeJesus seeks to hold Defendants liable—Ohio Revised Code § 2307.60—authorizes a civil action for damages, but only for damages caused by criminal acts. *See* Ohio Rev. Code § 2307.60(A)(1); *Jenkins v. EVO Servs. Grp., LLC*, No. 2:23-CV-01874, 2024 WL 691350, at *4 (S.D. Ohio Feb. 20, 2024) (Marbley, J.) (applying Ohio law and recognizing that a claim under Ohio Revised Code § 2307.60 requires a criminal act (citation omitted)). Officer DeJesus has not established that there is a triable issue as to whether the City or its officials committed any criminal acts.

Thus, the Court **GRANTS** summary judgment to Defendants on Officer DeJesus's state-law claims.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment (ECF No. 19) is **GRANTED in part** and **DENIED in part**.[6] The Motion is **GRANTED** as to Officer DeJesus's official capacity claim against Mayor Compton and his state-law claims against Defendants. The Motion is **DENIED** as to Officer DeJesus's personal capacity claim against Mayor Compton and municipal liability claim against the City.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

[6] To the extent that Officer DeJesus asks the Court to disqualify Defendants' counsel under the Ohio Rules of Professional Conduct (*see* Resp., PAGEID # 506 n.2), the Court **DENIES** that request as insufficiently supported and speculative.